FIRST NAT. BANK OF WELLSTON *v.* ARMSTRONG.

*(Circuit Court, S. D. Ohio, W. D.   April 12, 1890.)*

1. BANKS AND BANKING—RECEIVER—TRUST FUND.
    Checks and drafts sent from one bank to another were indorsed "for collection," and credited "subject to payment," according to the dealings between the banks. Part of them were paid to the receiver of the latter bank after its failure, and the balance were credited to it by the payors. *Held,* that the amount paid the receiver should be accounted for as a trust fund, but the balance as a general debt.

2. SAME—NATIONAL BANKS—ORGANIZATION.
    Under Rev. St. U. S. § 5136, providing that no banking association shall transact any business except such as is incidental and necessarily preliminary to its organization, until it has been authorized by the comptroller to commence the business of banking, correspondence between one bank and the person who became the president of a bank afterwards formed cannot constitute an agreement controlling the business between the banks, but may be referred to, in connection with other evidence, to show what was their understanding.

In Equity.
*John T. Moore* and *David Davis,* for plaintiff.
*Kittredge & Wilby* and *John W. Herron,* for defendant.
Before JACKSON and SAGE, JJ.

SAGE, J.   This cause was submitted to the court upon an agreed statement of facts, from which it appears that on the 17th day of June, 1887, the complainant mailed at Wellston, Jackson county, Ohio, to the Fidelity National Bank at Cincinnati, checks and sight-drafts on various banks other than the Fidelity to the amount of $2,229.01. Each of said checks and drafts was indorsed as follows:

"Pay Fidelity National Bank of Cincinnati, Ohio, or order, for collection for First National Bank of Wellston, Ohio.

"J. H. SELLERS, Jr., Cashier."

At the same time the complainant so charged the Fidelity Bank with the remittance, which was received by the Fidelity Bank on the 18th of June, and acknowledged by postal, mailed on the evening of that day, as follows:

"THE FIDELITY NATIONAL BANK.

"CINCINNATI, June 18, 1887.

"In reply to yours of the seventeenth, we credit, subject to payment, $2,229.01.                                            AMMI BALDWIN, Cashier."

On the same day credit was given accordingly by the Fidelity Bank to complainant.   On the 18th day of June, 1887, the complainant mailed to the Fidelity National Bank the further sum of $3,284.54 in checks and sight-drafts on various banks other than the Fidelity, all of which were received by the Fidelity on the 20th of June, and receipt thereof acknowledged by postal of that date, signed by the cashier, and stating a credit, "subject to payment," of $3,284.54.   It further appears that such credit was on that day given by the Fidelity Bank to the complainant.   Each of the checks and drafts composing said remittance of $3,284.54 was indorsed by the complainant in the same form as the in-

dorsements upon the checks and drafts remitted as first above. All the indorsements of both remittances were made by means of a stamp furnished by the Fidelity Bank to the complainant about the 1st of May, 1887, to be used by the complainant in indorsing commercial paper to the Fidelity for collection. The checks and drafts composing the last remittance were charged by the complainant to the Fidelity in the same manner as those composing the first remittance. It further appears from the agreed statement that Baldwin and Sellers were at the dates aforesaid cashiers of the Fidelity and of the Wellston Banks, respectively; also, that on the 17th of June the Fidelity Bank was insolvent, and so continued, and on the 20th of June, 1887, at the close of business hours, a national bank inspector or examiner, under orders of the comptroller of the currency, and by authority of the statutes of the United States, took possession of the Fidelity Bank, and afterwards the defendant Armstrong was appointed, and now is, the receiver thereof. The total amount of commercial paper remitted by the complainant to defendant was $5,513.55. Of this there was paid to the receiver, after the failure of the Fidelity Bank, the sum of $3,336.40. The residue of said remittances—that is to say, the sum of $2,177.15—was credited by various payors to the Fidelity Bank, and the Fidelity Bank had full benefit thereof in its accounts with the payors; but the money did not come into the hands of the receiver, and advice of the credits did not reach the Fidelity Bank until after the government had taken possession. Attached to the answer of the defendant are copies of two letters which it is admitted were written and received. The first is dated at Cincinnati, September 16, 1886, and addressed to H. S. Willard, Wellston, Ohio. Mr. Willard was afterwards president of the complainant bank. This letter was written and signed by E. L. Harper as vice-president of the Fidelity Bank. It refers to a letter received from Willard, which is not in evidence, nor set forth in the agreed statement of facts. Harper writes as follows:

"We are in receipt of your esteemed favor, and, replying, have to say that we will credit sight items on any point in the United States where there are banks at par, and make collections on same points, which, when paid, will credit at par, allowing you two and a half per cent. on daily balances, calculated when monthly statements are rendered, and will remit for your credit to New York, against your balances, at any time you may desire, without charge, or will ship you currency; express charges at your cost."

On the 25th of September, 1886, Willard, upon a letter-head of the Milton Furnace & Coal Company of Wellston, of which he was president, addressed a letter to Harper as vice-president, signing it "H. S. WILLARD, Pt.," accepting the offer contained in Harper's letter of the 24th, above quoted. These letters were written, mailed, and received several days before the complainant bank received its certificate of authorization, which was issued and bears date October 6, 1886. The complainant and the Fidelity Bank did business with each other in the usual way, each remitting to the other checks and drafts for collection, all of which were charged and credited, respectively, as above stated.

From and after about May 1, 1887, the balance was always in favor of the complainant, against which the complainant drew as occasion required, and sometimes ordered remittances made in exchange on New York. The complainant was allowed and received interest on the daily balances so in its favor at the rate of $2\frac{1}{2}$ per cent.; settlement of such interest being made monthly. No part of the several sums above mentioned has been paid to the complainant, either by the receiver or by any other person. The prayer of the bill is that the court find that the complainant's claim for $3,336.40, with interest from June 17, 1887, is a preferred claim against the estate in the hands of the receiver, and for a decree for its payment in full, and for general relief.

The claim of the defendant that the various checks and drafts referred to and set forth in the bill, were sent to the Fidelity Bank, and received by it, under and by virtue of the written agreement evidenced by the letters above quoted, is overcome by the fact that the last clause of section 5136, Rev. St. U. S., which relates to the corporate powers of banking associations, provides that "no association shall transact any business except such as is incidental and necessarily preliminary to its organization, until it has been authorized by the comptroller of the currency to commence the business of banking." See *Armstrong* v. *Bank*, 38 Fed. Rep. 883. That correspondence was, however, admitted in evidence, and may properly be referred to in connection with the evidence relating to the transaction of business between complainant and the Fidelity Bank, as a circumstance to aid in determining what was the actual understanding between them. It does not appear, however, that the complainants ever did draw against its remittances before the proceeds of collections were received by the Fidelity Bank, even if it be assumed that the understanding was in accordance with the terms stated in the correspondence. It is clear that the remittances were not sight items, within the true construction of that correspondence, nor within the understanding of the parties. Sight items on any point in the United States where there are banks, were, according to the correspondence, to be credited at par. Collections on same points were to be credited at par when paid. Every item in the remittance made by the complainant to the Fidelity Bank was indorsed as a collection, the indorsement being made by means of a stamp furnished by the Fidelity for that purpose. That the indorsement was restrictive, and that it did not pass title to the Fidelity Bank, is clear beyond doubt. That it was not at the time regarded by the Fidelity Bank as passing the title is also clear, both from the language of the postal acknowledgments of receipt of the remittances, and from the fact that the credit in every case was, in terms, "subject to payment." It was to the advantage of the Fidelity Bank that remittances should be for collection, and not as sight items, because the arrangement for interest to be paid by the Fidelity Bank, if it be assumed that it was as stated in the correspondence, was such that it would begin to run at once upon sight items, but would be postponed upon collections until receipt by the Fidelity of the proceeds. It may fairly be assumed that for this reason the Fidelity Bank furnished the stamp to

be used by its correspondent in indorsing paper to be transmitted for collection.

The case of *First Nat. Bank of Elkhart* v. *Armstrong*, 39 Fed. Rep. 231, which was cited by counsel for the government, is clearly distinguishable from this case. In that case the drafts were remitted to the Fidelity Bank "for collection" for the First National Bank of Elkhart, Ind., but each draft was, upon its receipt by the Fidelity Bank, credited to the First National Bank of Elkhart, Ind., as cash; and that, as had been agreed between said banks, gave to the Elkhart bank the right to draw upon the same as cash. Such had been the uniform custom and understanding of both banks. It was held by the court that, although it was also their uniform custom and understanding that, when any draft should be returned to the Fidelity Bank unpaid, it should be charged back to the Elkhart bank and returned to it, the title to the draft passed to the Fidelity Bank upon its being received and credited as cash, as above stated; or, in other words, that the indorsement for collection, under the special circumstances of that case, did not reserve to the Elkhart bank any title to the proceeds of the drafts. But here, even if we take the correspondence as the best evidence of what the arrangement really was, (and this is adopting the view most strongly in favor of the receiver,) we find that the remittances were for collection, that the credits were subject to receipt of proceeds, and that the contract was that they were to be credited at par when paid. The case of *Fifth Nat. Bank* v. *Armstrong*, 40 Fed. Rep. 46, is in point, and sustains the view which we take of this case. There the draft remitted was indorsed for collection for the claimant. It appears from the syllabus that it was the practice of the Fidelity Bank, in its dealings with the claimant, to credit the latter on the date of the receipt of all drafts, checks, etc., sent for collection that were payable at sight or on demand, and the balance thus created was subject to be drawn on; but, if the paper was not paid, it was charged back to the claimant. On receipt of the draft in question in that case, the Fidelity Bank notified the claimant that it had been credited "subject to payment;" but the credit was not drawn against, nor were advances made on the faith of it. It was held that, the indorsement being restrictive, the Fidelity Bank acquired no title to the draft, and that, upon the insolvency of the Fidelity Bank before the receipt of the proceeds of the draft, the claimant was entitled to the proceeds against the receiver. In that case the credit was, as in this case, conditional, and not, as it was in the *Elkhart Case*, unconditional; and there was wanting the agreement which was found to exist in the *Elkhart Bank Case*, that the credit should be as cash, and that the Elkhart bank should have the right to draw upon the same as cash. In the case of *Commercial Nat. Bank* v. *Armstrong*, 39 Fed. Rep. 684, the Fidelity Bank addressed to the Commercial Bank a letter offering any one of four propositions: *First*, to collect all items at sight, and allow 2½ per cent. interest on daily balances, calculated monthly; and, *second*, to collect at par all points west of Pennsylvania, and remit the 1st, 11th, and 21st of each month. The other two propositions need not be stated. The Com-

mercial Bank accepted the second proposition. The court said that the first proposition perhaps contemplated a creditor and debtor relation, but the second, third, and fourth, upon their face, did not. But it is to be observed that even upon the first proposition the interest, by fair construction, was to be calculated from the date of the receipt of the proceeds, rather than from the date of the receipt of the draft or other paper. It is clear, therefore, that the ruling in the *Commercial Bank Case* is not in conflict with the conclusion in this case,—that the relation of debtor and creditor did not arise upon receipt of the paper, but, in the true construction of the arrangement as it existed, was postponed until the receipt of the proceeds of collection. The case of *Manufacturers' Nat. Bank* v. *Continental Bank*, 148 Mass. 558, 20 N. E. Rep. 193, which was cited for the complainant, states very clearly the distinction upon which the conclusion in this case rests. In that case, checks and drafts were mailed to the Fidelity Bank, indorsed by stamp as follows: "Pay Fidelity National Bank of Cincinnati, Ohio, or order, for collection for Manufacturers' National Bank of Boston, Mass." The Fidelity Bank received the checks and drafts on June 20, 1887, and on that day mailed to the plaintiff a postal-card, signed by its cashier, stating in reply: "We credit, subject to payment, $3,501.48." On the same day the Fidelity Bank credited the plaintiff the same amount, and mailed to the defendant, a national banking association located at St. Louis, the check in question, for $1,900.66, on the German American Bank of St. Louis, the same being one of those received, and indorsed upon it, by stamp: "For collection for account of the Fidelity National Bank, June 20, 1887, Cincinnati, Ohio. AMMI BALDWIN, Cashier." The failure of the Fidelity Bank became known to the complainant on the morning of June 21, 1887, and to the defendant after the receipt of the check in question, but before it had credited it. The court held that in the transaction the plaintiff and the Fidelity Bank stood in the relation of principal and agent, and that their contract contained in their letter showed, first, an offer to the plaintiff, by the Fidelity Bank, of its "services for making collections in the west," and then a proposition to credit sight items at par, subject to payment, and to make collections, remitting weekly in New York exchange, without charge. The court say:

"This proposition was accepted by the plaintiff, and the Fidelity National Bank thereby became the plaintiff's agent to collect for it commercial paper. Under this arrangement the credit given for a check was merely provisional until the check was paid. It did not create a debt from the Fidelity National Bank to the plaintiff, and it did not change the ownership of the check. *Levi* v. *Bank*, 5 Dill. 104; *Balbach* v. *Frelinghuysen*, 15 Fed. Rep. 675. In that respect, their relations to each other were very different from those between a banker and a depositor when checks are received on deposit as cash, and an absolute right to draw against them is given. *White* v. *Bank*, 102 U. S. 658; *Scott* v. *Bank*, 23 N. Y. 289; *Dickerson* v. *Wason*, 47 N. Y. 439; *Bank* v. *Loyd*, 90 N. Y. 530; *Ayres* v. *Bank*, 79 Mo. 421."

The liability of an indorser of commercial paper for the default of the payor, excepting in cases where the indorsement is "without recourse," not being affected by the fact that the transferee is also a purchaser for

value, it was rightly held in *Elkhart Bank* v. *Armstrong*, cited above, that, where it appears from the evidence that the remittance was by agreement received as cash, credited as cash, and subject to check or to draft, the fact that the paper remitted was indorsed "for collection," and the further fact that it was the understanding that, if not paid, the amount should be charged back to the sender, did not change the character of the transaction, although it did provide a short mode of adjustment between the parties. But here there was no agreement such as was shown in that case. On the other hand, not only was the indorsement "for collection," but the credit by the Fidelity Bank was, in terms, "subject to payment." This was clearly a provisional credit only. The title did not pass; and the proceeds of the collections which were received, not by the Fidelity Bank, but, after its failure, by the receiver, must be treated as trust funds in his hands, subject to the claim of the complainant, to whom they belong.

The decree will be in favor of the complainant, for the payment by the receiver of the sum of $3,336.40, the proceeds of collections upon remittances made by the complainant to the Fidelity Bank, which were not received by the bank, but came into the receiver's hands after the failure of the bank. As to the residue, to-wit, the sum of $2,177.15, the decree will find that the complainant is a general creditor of the Fidelity Bank, and as such entitled to dividends. The costs will be taxed to the defendant.